Electronically Filed
5/20/2016 10:16:56 AM
Karen Phillips, Smith County Clerk
Reviewed By: Ayana Hill

65514-A

CAUSE NO. _____

| | | |
|---|---|---|
| RICHARD SMITH, ET AL | § | IN THE SMITH COUNTY |
| | § | |
| | § | |
| V. | § | COURT AT LAW |
| | § | |
| | § | |
| | § | |
| W.D. HILTON, JR., ET AL | § | NUMBER \_\_\_2\_\_\_\_\_ |

## PLAINTIFFS' ORIGINAL PETITION

COMES NOW, Richard Smith, Mark Little and Larry Garrett (hereinafter referred to as "Plaintiffs") and files this Petition complaining against W.D. Hilton, Jr., James A. Hugeunard, Randall Grooms, Jr. and Trust Services, Inc.

1.     Plaintiff Richard Smith is a former employee of Tyler Pipe Industries of Texas ("Tyler Pipe") and resides in Smith County, Texas.

2.     Plaintiff Mark Little is former employee of Tyler Pipe and resides in Gregg County, Texas.

3.     Plaintiff Larry Garrett is former employee of Tyler Pipe and resides in Tarrant County, Texas.

4.     Defendant Trust Services, Inc. ("TSI") is a corporation and may be served with citation herein by certified mail, return receipt requested, through its registered agent for service, W.D. Hilton, Jr., 2716 Lee Street, Suite 500, Greenville, Texas, 75401.

5.     Defendant W.D. Hilton, Jr. ("Hilton") is a Texas resident and may be served with citation herein by certified mail, return receipt requested, at 2716 Lee Street, Suite 500, Greenville,

1



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

Texas, 75401. Hilton is being sued both in his individual capacity and fiduciary capacity as a trustee.

6.      Defendant James A. Huguenard ("Huguenard") is a Texas resident and may be served with citation herein by certified mail, return receipt requested, at 2777 Allen Parkway, 14th Floor, Houston, Texas 77019. Huguenard is being sued both in his individual capacity and fiduciary capacity as a trustee.

7.      Defendant Randall D. Grooms, Jr. ("Grooms") is a Texas resident and may be served with citation herein by personal service at Citizens 1st Bank, 2001 ESE Loop 323, Tyler, Texas, 75701. Grooms is being sued both in his individual capacity and fiduciary capacity as a trustee.

## CASE LEVEL ASSIGNMENT

8.      Plaintiffs would show discovery in this cause should be conducted pursuant to Level 3 of the Discovery Control Plan, as set forth in Rule 190 of the Texas Rules of Civil Procedure, in that Plaintiffs affirmatively plead that they seek monetary relief aggregating $50,000.00 or more, excluding costs, pre-judgment interest and attorneys' fees.

## STATUTE OF LIMITATIONS

9.      Plaintiffs allege this lawsuit has been filed within the time period of the appropriate statute of limitations from the date of occurrence. In the alternative, Plaintiffs allege the statute of limitations is tolled because this lawsuit has been filed within two (2) years of the date Plaintiffs knew or should have known of the existence of a cause of action, or any delay is the result of direct threats or fraud on the part of the Defendants


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

## JURISDICTION AND VENUE

10.     The venue of Smith County, Texas is proper in this case. Defendant Randy Grooms is a resident of Smith County. Further, a substantial part of the events or omissions giving rise to Plaintiffs' cause of action arose in Smith County.

11.     Pursuant to § 15.005 of the Texas Civil Practices & Remedies Code, proper venue for one defendant establishes proper venue for all defendants in all actions or claims arising out of the series of transactions or occurrences.

## PREAMBLE

12.     This lawsuit has become necessary to put an end to widespread abuse and misuse of Trust assets intended for beneficiaries such as Plaintiffs. As discussed below, the Defendants have engaged in self-dealing from the inception of the trust in direct contravention of the Swan Trust Agreement; wasted millions of dollars of Trust assets; intentionally delayed Plaintiffs' claims; mismanaged the Trust by providing preferential treatment of certain claim holders to the detriment of other claimants; intentional subversion of Plaintiffs' claims; and retaliation for questioning Defendants' malfeasance. Accordingly, the Swan Trust needs a complete overhaul; therefore, Plaintiffs immediately request an evidentiary hearing to determine the necessity of the appointment of a receiver during the pendency of this lawsuit.

## FACTUAL BACKGROUND

13.     Hundreds of workers, including Plaintiffs, at the Tyler Pipe Foundry contracted irreversible lung diseases such as asbestosis, silicosis, mixed-dust pneumoconiosis, lung cancer and mesothelioma as a result of being subjected to deplorable and horrific working conditions.

14.     Plaintiffs were forced to endure slave-like working conditions. As the New York Times wrote in an article entitled: "At a Texas Foundry, An Indifference to Life":

3


TRUE AND CORRECT COPY OF ORIGINAL FILED IN SMITH COUNTY CLERK'S OFFICE

> It is said that only the desperate seek to work at Tyler Pipe, a sprawling, and rusting pipe foundry out on Route 69, just past the flea market. Behind a high metal fence lies a workplace that is part Dickens and part Darwin, a dim dirty, hellishly hot place where men are regularly disfigured by amputations and burns, where turnover is so high that convicts are recruited from local prisons, where some workers urinate in their pants because their bosses refuse to let them step away from the manufacturing line for even a few moments.

An OSHA inspection report confirmed the Times' description of working conditions:

> Tyler Pipe is a gray iron foundry. Throughout the plant, molten metal is seen spilling from the cupolas, bulls and ladles. The forklift trucks transport the metal, and the ground behind the trucks often smokes with puddles of molten metal. Workers are covered with black residue from the foundry sand. Many work areas are dark, due to poor lighting and clouds of sand. Despite all the ignition and fuel sources, exit paths are not obvious. Many workers have scars or disfigurations which are noticeable from several feet away. Burns and amputations are frequent. This facility is located in a relatively small town where jobs are not plentiful. Throughout the plant, in supervisors' offices and on bulletin boards, next to production charts and union memos, is posted in big orange letters: REDUCE MAN HOURS PER TON.

15.     Top federal and state regulators described the company's business as "lawless" and "rogue.' It was a system that assumed widespread fraud and often subjected workers reporting injuries to disciplinary action, and sometimes firing.

16.     Consequently, troubled Tyler Pipe plead guilty in federal court to two felonies and agreed to pay a $4.5 million fine for violating environmental laws and hiding information from government regulators. It is little wonder the PBS television program "Frontline" called Tyler Pipe "one of the most dangerous employers in America."

17.     In addition to its criminal troubles, Tyler Pipe and its parent corporation Swan Transportation Company ("Swan") were confronted with hundreds of lung disease claims. These tort claimants filed claims against Swan (rather than their employer, Tyler Pipe) for their injuries under the "Good Samaritan" theory of liability based on Sections 323 and 324A of the

4


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

Restatement (Second) of Torts. With respect to Swan, the Tort Claimants alleged that Swan, acting as a "Good Samaritan," undertook the responsibility of providing a safe workplace for the employees of the Tyler Pipe Foundry and that Swan failed to provide a safe workplace, which resulted in hundreds of employees' irreversible injuries.

18.     In July 2000, the first trial against Swan commenced in Smith County, Texas. The trial consisted of eight Tyler Pipe Foundry workers suffering from asbestosis and silicosis. After an approximately two-week trial a jury rendered a verdict in favor of the eight Plaintiffs against Swan in the aggregate amount of $9,916,689.01. Immediately thereafter, a second case was called to trial in August 2000 in Dallas County. The trial consisted of seven plaintiffs who were employees of the Tyler Pipe Foundry suffering from asbestosis. After approximately a two-week trial, a jury rendered a verdict in favor of Plaintiffs against Swan in the aggregate amount of $19,404,526.51. Thus, the fifteen trial Plaintiffs averaged approximately $2 million per Plaintiff when a jury of their peers assessed their damages. Importantly to the instant case is that Swan's main defense, presented through its hired medical experts, was that the Plaintiffs did not suffer from or have medical evidence of asbestosis. This defense was universally rejected by the Jury for each and every one of the fifteen trial Plaintiffs.

### 1.  Creation of 524(g) Bankruptcy Trust

19.     As a result of the aforementioned jury verdicts, a subsequent default judgment in the amount of $17,537,921.01 and hundreds of unresolved claims, Swan filed its chapter 11 case on December 20, 2001. Swan utilized section 524(g) of the U.S. bankruptcy code to reorganize and establish a bankruptcy trust to pay current and future asbestos, silica and mixed dust claimants and channel claims away from the reorganized company. Consequently, the Swan Asbestos and


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

Silica Settlement Trust ("the Trust") became effective December 23, 2003. The Trust has been funded with over $125,000,000 since its inception.

20.    Importantly, every official and authoritative document and public filing of the Trust all mandate equitable treatment of all claimants:

- Swan's Disclosure Statement in the Bankruptcy Court states "...the Plan provides for maximum recoveries to, and the expeditious and equitable treatment of holders of all Claims";

- Swan's Settlement Trust Agreement states the intent of the Trust is "...to pay all Asbestos and Silica Claims that involve similar claims in substantially the same manner";

- Swan's Claim Resolution Procedures state: "the Trustees must act in a manner designed to provide substantially the same treatment to each holder of a Claim"; and

- Swan's Audited Consolidated Financial Statements state "the Trustees are responsible for supervising and administering the claims resolution process set forth in the CRP (Claims Resolution Procedures) so that all holders of similar Asbestos or Silica Claims are treated in a substantially equivalent manner to other holders of Asbestos or Silica Claims.

21.    This undeniable mandate to treat claimants in a substantially equivalent manner has been utterly abused by the Trustees.

22.    At the commencement of bankruptcy, the law firms of Barron & Budd; Negem, Bickham, & Worthington; and Shelton Smith & Associates had the largest amount of claims against the Trust. As a result, Russell Budd, Jimmy Negem and Shelton Smith were appointed to the

6


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

Trustees' Advisory Committee (the "TAC"). The TAC "shall participate with the Trustees in the implementation of the CRP by providing consultation with respect to critical issues affecting the Trust." Important to this lawsuit, each of the TAC members handpicked the Trustees of Swan with Russell Budd selecting Hilton, Jimmy Negem selecting Grooms and Shelton Smith selecting Huguenard. As set forth below, claimants represented by TAC members were treated vastly more favorable than Plaintiffs and other claimants not represented by the TAC, all in direct violation of the Trust mandate to treat claimants in substantially the same manner.

### 2.  Self-dealing at the Onset

23.     More disturbing, however, is the blatant self-dealing of the managing Trustee, Hilton, who has from day one of his duties been engaging in unlawful self-dealing, which is an egregious breach of fiduciary duty. Hilton has been the chief officer and a director of Trust Services, Inc. for years before the formation of the Swan Trust. TSI has managed through manipulation, deception and non-disclosure of conflict of interests to get itself as a claims administrator for various asbestos and silica trusts, including the Swan Trust. TSI has created a cottage industry diverting millions of dollars from intended beneficiaries suffering irreparable lung disease to a select inner circle. The amount of money being diverted to Trustees, outside counsel and insurance brokers is simply mindboggling, and this culture was created by Hilton, who has been self-dealing in the Swan Trust since its inception.

24.     Four years before the formation of the Swan Trust, Hilton was scolded by a federal judge for the exact impermissible activities he is conducting in the Swan Trust. In re *National Gypsum Company* (NGC) 243 B.R. 676 (1999), Hilton positioned himself as both Trustee and a president of TSI in connection with the NGC Settlement Trust. The trust agreement in NGC had the exact self-dealing clause as the Swan Trust, which stated: "The Trustees shall not have the power to


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

enter into any contract or otherwise engage in any transaction with any Trustee or any person affiliated with any Trustee." The Bankruptcy Court in NGC laid out the black letter of the law when it came to Trustees attempting to self-deal. As the court stated:

> Texas law governs the trust, NGC Trust Agreement § 7.10. As an express trust, the Texas Trust Code applies. Tex. Prop.Code Ann. § 111.003. As here relevant, the express terms of the trust agreement prevail. Tex. Prop.Code § 111.002(a). The trust agreement specifically provides: "The Trustees shall not have the power to enter into any contract or otherwise engage in any transaction with any Trustee or any Person affiliated with any Trustee." § 3.01€. This provision of the trust reflects Texas Trust Code § 113.053(a).
>
> * * *
>
> The trust agreement, reflecting Texas Law, recognizes that trustees may not engage in self-dealing. *InterFirst Bank Dallas, N.A. v. Risser*, 739 S.W.2d 882, 888 (Tex.App.-Texarkana 1987). When a person accepts a fiduciary position, he consents as a matter of law to have his conduct concerning the trust measured by the standards of the finer loyalties exacted by courts of equity. The trustee may not use his position to gain personally at the expense of the trust. Nor may the trustee place himself in a position where his self-interest may conflict with his obligations as a trustee. These standards extend to every variety of circumstances. *Slay v. Burnett Trust*, 143 Tex. 621, 187 S.W.2d 377, 387-388 (1945).
>
> When a trustee acts in his own interest in connection with the performance of his duties as trustee, the standard of behavior becomes more rigorous. Scott on Trusts § 170.25 (4th Ed.1987), at 436. Usually, a trustee may not sell to the trust his individual property or property in which he has a personal interest of such a substantial nature that it might affect his judgment. Restatement (Second) of Trusts § 170 (1957 Main Vo.), at 367; Scott on Trusts § 170.12, at 351. The Restatement instructs that it is immaterial that the trustee acts in good faith in purchasing the property for the trust, and that he pays fair consideration. *Id.* Consequently, the proposal that the trust purchase Hilton's stock in TSI is problematical.
>
> In that context, the court observes that the trustee may not delegate his trust duties. Scott on Trusts § 171 (4th Ed.1987), at 438. Upon acceptance of the trust by the trustee, the trustee is under a duty to the beneficiaries to administer the trust. Restatement (Second) of Trusts § 169. The trustee cannot commit the administration of the trust to an agent or a co-trustee or another person, unless permitted by the trust agreement. Restatement (Second) of Trusts § 171, at 374. And where a trustee has properly delegated to agents or co-trustees or other persons, the trustee maintains


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

a duty to exercise general supervision over their conduct. *Id.*, at 376. Where a trust has several trustees, each trustee has a duty to participate in the administration of the trust. Restatement (Second) of Trusts § 184, at 394. These standards guide the court's exercise of discretion.

* * *

In addition, Hilton, as trustee, must perform his duties without delegation and must administer the trust. He cannot allow his personal employment opportunities to interfere with his duties to administer the trust. TSI's business of providing administrative services compromises Hilton's efficacy and usefulness as a trustee. First as a managing trustee, then as an owner of TSI and now as the proposed president of TSI commanding significant private business of trust administration, Hilton has had to delegate his trustee duties in part to Kahn and Taggart. That delegation of trustee duties must necessarily increase with this transaction.

Because they have used Hilton as the managing trustee, Kahn and Taggart already have to make compensation decisions without the benefit of the trust's third trustee, Hilton. Hilton cannot participate in the decisions concerning TSI. Hilton cannot participate in the trust's deliberations concerning administrative decisions. With Hilton as president of TSI, paid by TSI, using TSI as a vehicle for a substantial practice of providing administrative services to asbestos trusts, and with TSI providing administrative services to the trust, Hilton must excuse himself from performing his trustee's duties concerning matters to be performed by TSI. Hilton will not be able to perform trust duties concerning decisions about the financial services, investment services, administrative services, insurance collection services, litigation management services and claims management services to be performed by TSI under contract. Kahn and Taggart must perform those trustees' duties as if the trust was a two-trustee body, with Hilton at TSI executing those decisions as if merely a third party professional retained by the trust. Hilton would be delegating duties to his co-trustees and would be unable to perform supervisory duties where delegation to a third person may be appropriate.

* * *

But in the evolution of that process, Hilton's interest in providing administrative services under contract and/or through TSI has the appearance, if not the reality, of personal gain and has necessarily interfered with his duty to administer the trust and not to delegate trustee *683 duties. Two rather than three trustees have the duties imposed by the trust agreement on all three trustees to administer the trust whether directly or through contract or through establishing a jointly-owned facility. It appears to the court that Hilton has compromised his ability to fully perform his trustee duties without encumbrance or hindrance. He

9



TRUE AND CORRECT COPY OF ORIGINAL FILED IN SMITH COUNTY CLERK'S OFFICE

thereby imposes on Kahn and Taggart a disproportionate amount of trustee duties not contemplated by the trust agreement establishing three trustees.

Nor can the court take comfort by the assertion that the transaction has been negotiated at arm's length. The interrelationship of the trustees of the two trusts and the TSI employees compromises an arm's length negotiation.

The court has thus become concerned with the disintegrating erosion of particular exceptions. If indeed Hilton has become a professional, valued administrator, the court questions whether he should now pursue that work without the fiduciary restrictions of being a trustee. However logical or natural the evolution of circumstances and however justified from a market place perspective, the court questions whether the proposed transaction would result in placing the administration of the trust at the "level…trodden by the [marketplace] crowd." Having moved over time from merely administering the NGC Settlement Trust, the court now suggests that Hilton consider resigning as a trustee of the NGC Settlement Trust. A new trustee could then be appointed. The three trustees could then evaluate the proposed transaction without the cloud of the present circumstances.

25.     In the instant case, Hilton has placed his personal interest and TSI's interest ahead of the beneficiaries, all at the expense of the Trust. Hilton has been engaging in self-dealing from day one of his managing trustee duties. Moreover, it is the exact conduct that a federal judge told him years earlier was prohibited. With the assistance of his bankruptcy inner circle, to be the subject of another RICO lawsuit, Hilton managed to get TSI as the de facto manager of all activities of the Trust. Hilton has been an officer and director of TSI during the entirety of his tenure as managing trustee of the Swan Trust.

26.     Just like the National Gypsum case, Hilton, as managing trustee, cannot perform his duties without delegation because his personal opportunities interfere with his duties to administer the Trust. Because Hilton as an officer and director of TSI, paid by TSI, and using TSI as a vehicle to siphon Swan Trust assets and other trusts' assets for ostensibly providing administrative services, Hilton has had to excuse himself from performing his trustee's duties

10

 TRUE AND CORRECT COPY OF ORIGINAL FILED IN SMITH COUNTY CLERK'S OFFICE

concerning matters to be performed by TSI. Hilton's self-dealings and blatant conflict of interests have caused many of the administrative duties to be impermissibly delegated to co-trustees. Specifically, Swan's other trustees, Grooms and Huguenard have served as the Audit Committee of the Trust. Further, Grooms and Huguenard have to make compensation decisions without the benefit of Hilton's input. Hilton's self-dealing and conflicts of interests have effectively prevented his participation in the Trust's deliberations concerning administrative decisions.

27.      Hilton has further violated his fiduciary duty concerning his self-dealing by failing to disclose his personal interest in TSI to one single beneficiary. He has kept all beneficiaries in the dark for over a decade while TSI and Hilton have literally bilked the Swan Trust for millions of dollars, which otherwise should have gone to the intended beneficiaries of the Trust. This is not an isolated case; Hilton has been self-dealing in numerous other Trusts without any notice to the beneficiaries to whom he owes fiduciary duties, including duties of utmost loyalty and full disclosure.

28.      Grooms and Huguenard aided and abetted Hilton's self-dealing breach of fiduciary duty by agreeing to allow Hilton not to fulfill his non-delegable duties as a trustee. Furthermore, Grooms and Huguenard breached their fiduciary duties to the trust beneficiaries by concealing Hilton's self-dealings, thereby breaching their duty of loyalty and full disclosure to Plaintiffs and beneficiaries of the Trust.

### 3.  The Undisclosed Self-Dealing Has Caused a Misuse of Trust's Assets

29.      During the bankruptcy confirmation process and prior to the final formation of the Trust, it was represented under oath by one of Swan's economic experts that the total administrative costs over the life of the Trust would only be $910,000.00. Hilton was fully aware of this


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

representation since he attended a hearing on December 19, 2002 where Sandy Esserman, Hilton's long-time counsel, reiterated the total lifetime figure of $910,000.00. Shockingly, the Trust, managed by TSI, blew the lifetime budget (50 years) in its first full operating year. In fact, the Trust spent $1,800,189 in operating expense in 2004 alone. To date, the Trust has exceeded the lifetime budget by over 1300%. Even when litigation costs for pursuing Trust assets are excluded, the Trust exceeded the lifetime budget by 850%, with over 30 years of expected claims left according to the Trust's forecasting expert.

30.     Unconscionably, the administrative cost for the last ten years of the Trust has consistently exceeded over $10,000.00 for each processed claim. Specifically, the Trust in 2006 spent $543,706 operating the Trust while it only paid 27 claims the entire year. In other words, it cost the Trust $20,137.00 for each asbestosis or silicosis claim for which it only paid $12,000.00. In 2007, administrative costs were $65,000.00 to pay each non-malignant claim of approximately $20,000.00. In fact, over the last four years the Trust's expenses exceeded the total amount of money paid to injured claimants. Shockingly, the long-time Claims Manager recently testified that the gross disparity between the costs per plaintiff versus the proceeds received per plaintiff did not trouble her because she simply "wasn't part of those discussions."

31.     Just to put the financial misuse in context, another trust managed by TSI, the Clemtex Silica Trust has operated at a fraction of the cost as the Swan Trust. The long-time claims manager for both the Clemtex Trust and Swan Trust recently admitted under oath that it takes the same amount of time to process a Swan claim as a Clemtex claim, which is only an hour. The Clemtex Trust has graded 7026 claims and paid 3637 claimants while the Swan Trust has graded 3937 claims and paid 2545 claimants. Shockingly, the Swan Trust has expended approximately $12,560,000.00 in operating expenses since 2003 while Clemtex has only incurred

12


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

approximately $2,700,000.00 in operating expenses. This is despite the fact Clemtex has graded almost twice the amount of claims as the Swan Trust. Simply put, the fraud and waste at the Swan Trust is pervasive and widespread.

32.     More outrageous is the Trust has spent more on directors and officers' liability insurance to protect them from damages for their fiduciary breaches than the entire forecasted lifetime budget of $910,000 sworn to under oath to the Federal Bankruptcy Court. Far more than the lifetime budget has been handed out to the Trustees' counsel, who was responsible for getting Hilton appointed as managing trustee. It is a classic quid pro quo and counsel's bills will document useless, unnecessary, and redundant services. Hilton has also spent over $500,000 on forecasters and a majority of that on his recent hired gun whose only goal is to minimize the amount of money injured claimants receive. Every time, even when claim filings decrease, Hilton's hired gun changes his methodology to either lower or keep the payment percentage the same. This is further addressed in detail below.

33.     Counsel for Plaintiffs and others have repeatedly requested the Trust to immediately cease the misuse of Trust's assets. On several occasions the Trustees have been requested to reduce the number of trustees from 3 to 1 as called for in the Swan Trust Agreement. In fact, the Trust's counsel stated in writing on April 30, 2007, the Trust's new budget "contemplates a reduction in the number of trustees from three to one." Nine years later, the Trust has the same three trustees. In 2010, the Court-appointed Legal Representative for Unknown Claimants filed a Motion to Reduce the Number of Trustees. The basis for the Motion was the out of control costs. As the Motion states:

> Throughout 2009 and 2010, the Movants continued their efforts to persuade the Trustees to reduce their number and otherwise to reduce claim processing costs. The Movants' suggestion that the claims processing costs might be reduced by moving the process to a less


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

expensive facility [i.e. TSI] was rejected. And the Trustee did nothing to address reducing their number for the ostensible reason that a dispute as to the payment percentage continued to fester.

Finally, in August of this year [2010], the Trustees proposed that they voluntarily reduce their number from three to one and provided the Movants with a draft motion to that effect. **That motion also sought relief in favor of Trust Services, Inc. ("TSI"), the company that provides claims processing services to the Trust, in the form of both retroactive and prospective exculpation of TSI.**

The Movants informed the Trust that the relief in the draft motion pertaining to the reduction in the number of trustees was acceptable to them (with minor modifications to conform the refile to Texas trust law), but that relief in the draft motion pertaining to TSI appeared to be devoid of sound factual or legal basis, and if it was to be addressed at all, that should be by separate motion. As a result, the Trust has not filed the draft motion, and indeed has not further communicated their position on September 21, 2010 (and on October 2, 2010).

To date, there are three trustees even though claims are at a minimum.

34.     As the trial in this matter will show, this is Hilton's modus operandi: it is his way or the highway. Moreover, if you question his tactics then you suffer retaliation, to the detriment of your clients. Very telling is the mandatory exculpation for TSI in return for a reduction in trustees. Hilton knows both he and TSI have abused the Trust assets through their blatant self-dealing.

### 4.   Plaintiffs and Other Claimants are Receiving Disparate Treatment

35.     Despite the trustees' clear and unequivocal mandate of providing maximum recoveries to, and expeditious and equitable treatment of holders of all claims, the trustees have abandoned that policy and decided to intentionally discriminate against Plaintiffs and other similarly situated claimants. The trustees have ignored their fiduciary duty of utmost loyalty and good faith owed to Plaintiffs. Moreover, the breaches of loyalty and good faith appear to be committed in



TRUE AND CORRECT COPY OF ORIGINAL FILED IN SMITH COUNTY CLERK'S OFFICE

retaliation against Plaintiffs' counsel for questioning the trustees' unscrupulous behavior and management of the Trust.

36.     There is absolutely no comparison of the treatment of claimants represented by the TAC members who handpicked the trustees. For reasons that appear to be retaliatory, Plaintiffs and current claimants are offered one-half the amount of compensation received by claimants represented by TAC members. Plaintiffs' claims are delayed many months longer than those submitted by TAC members, even though there is a trickle of claims compared to when TAC members received payment. More importantly, Plaintiffs' claims are being subjected to rigorous medical requirements not required of TAC members or envisioned by the CRP of the Trust. Ignoring their duty of utmost loyalty and their mandate to maximize benefits to claimants, the trustees intentionally hired experts to subvert Plaintiffs' claims. Amazingly, the trustees now claim there is no compensable disease category for mixed dust pneumoconiosis, even though it is a recognized compensable disease under the CRP and the Trust previously paid millions to TAC member clients suffering from mixed dust pneumoconiosis.

### 5.  Plaintiffs Offered Unequal Compensation

37.     Each and every client represented by a member of the TAC received almost double the amount of compensation offered to current claimants. Specifically, 2169 claimants were paid the payment percentage rate of 13.2%, meaning a less severe silicosis, asbestosis or mixed dust claim would receive $26,400.00 from the Trust and a malignant claim would receive $79,200.00. The substantial majority of this money (in excess of $55,000,000.00) was paid to TAC member clients. In fact, the TAC members persuaded the trustees to make a supplemental payment in 2009. The trustees paid the same 2169 claimants $3,700,810.00, of which, TAC member clients again received a substantial majority. Importantly, the Trust had available only $23,546,810.00

 TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

in trust assets when it made the aforementioned supplemental payment.

38.     Suspiciously, the TAC members essentially quit filing claims after the supplemental payment. Moreover, at its next annual meeting, the trustees cut the payment percentage from 13.2% to 6.88%. Accordingly, ever since 2011, current claimants get approximately one-half the compensation received by the TAC member clients. Shockingly, the Trust's average cost per claim since the payment percentage reduction is greater than the amount a claimant suffering from silicosis, asbestosis, or mixed dust receives.

39.     More disturbing is that there are only approximately 200 claimants who were forced to take this suppressed payment reduction when in fact the Trust currently has more available assets than when it handed out a supplemental payment to the other 2169 claimants. The majority of the suppressed 200 claimants are represented by counsel for Plaintiffs. Upon information and belief, these clients are being unfairly treated in violation of the CRP due to retaliatory reasons discussed below. Even more disturbing than the unequal treatment in payment is the trustees' utter disregard for their duty of loyalty to Plaintiffs. The trustees in dereliction of their duties retained a hired gun, claims forecaster Thomas Vasquez ("Vasquez"), in order to artificially and intentionally suppress the payment percentage. This was done despite the fact that several hundred thousand dollars were spent on a previous forecasting company which prepared two separate forecasting reports of future claims.

40.     The trustees' new hired gun's opinion changes like the wind. Further, it will be unequivocally demonstrated that his opinions are unreliable and unscientific. For instance, in 2007, Vasquez charged over a hundred thousand dollars of the Trust's money and concluded from 2007 through 2050 there would be a high of 832 claims of which 75 would have lung cancer. In order to keep the payment percentage artificially depressed, Vasquez updated his



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

forecast in 2013. This forecast concluded there will be 730 future claims from 2013 through 2050. Incredibly, he concludes that 194 of the 730 will have lung cancer. This means one out of every 3.7 claims will be a lung cancer claim. This is completely dubious and out of touch with reality. For instance, of the 967 compensable post-bankruptcy claims paid by the Trust through September 30, 2013, there were only a total of 24 lung cancers. Yet, the new hired gun, in an effort to suppress Plaintiffs' compensation, forecasted 194 lung cancers from only 730 projected compensable claims. If Vasquez' lung cancer forecast had any credibility, it would result in the Tyler Pipe plant being immediately closed, quarantined and turned into a superfund site because of the preposterous lung cancer rate.

41.     The original forecasting company, NERA, which was abandoned by the trustees, prepared a report in 2005. NERA projected from 2005 through 2014 there would be 22 lung cancers. This almost precisely matches reality in which there were 24 lung cancer claims from 2004 to 2013. Vasquez even projected 51 lung cancers from 2035 to 2050 while NERA only projected 34 lung cancers from 2013 to 2050. The fact that any lung cancers are included after 2030 is shocking since the trustees know the Trust will be likely terminated by that date.

42.     The utilization and waste of Trust assets on Vasquez was done intentionally to suppress Plaintiffs' compensation rate. Not only is this a severe breach of loyalty owed to Plaintiffs, but is also an economic hardship to Plaintiffs resulting in an almost 50% reduction in compensation. The reality is since a lung cancer claim receives 300% more than a silicosis, asbestosis or mixed dust claim, Vasquez' forecast of 194 lung cancers is equivalent to forecasting an additional 582 claims. This voodoo forecasting has severely damaged approximately 200 claimants suffering from lung disease caused by deplorable working conditions. Further, the majority of these 200 claimants are represented by Plaintiffs' counsel.

17


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

### 6.  The Trustees Intentionally Subverted Plaintiffs' Claims by Changing the Medical Criteria and Eliminating a Disease Category

43.     During the entire time TAC members filed claims on behalf of their clients, not one client was subjected the rigorous medical review currently being imposed on Plaintiffs. While the TAC members received over $55,000,000.00 for their claimants totaling over 1325, the Trust was run by a presumptive evidentiary standard. This meant as long as there was compliance with the evidentiary requirements of the CRP, the claimant received prompt payment. For a non-malignant claim these standards required an x-ray interpreted by a certified NIOSH B-reader, and an independent medical exam by a board certified pulmonologist and proof that the claimant worked at least one year between 12/31/73 and 12/31/92; known as the "Good Samaritan Period." This is the process everyone envisioned when votes were cast to confirm the bankruptcy plan. And, in fact, this was the presumptive process employed for years, at least while TAC members were filing claims.

44.     Now for reasons that appear to be retaliatory, the trustees are making the process far more rigorous than the original jury trials that forced Swan into bankruptcy. The only defense Swan had at trials that resulted in 15 Plaintiffs averaging over $2,000,000.00 in damages was Swan's hired pulmonologist who concluded for every Plaintiff: "normal chest films and pulmonary function; no evidence of silicosis; and no evidence of asbestos-related disease." By contrast, Dr. Mark Klepper was the certified NIOSH B-reader who determined radiologically that each of the Plaintiffs' respective x-rays demonstrated pneumoconiosis (asbestosis or silicosis) characteristics according to NIOSH standards. The jury unanimously agreed with Dr. Klepper on each and every Plaintiff.

45.     In stark contrast to the treatment TAC clients received, Plaintiffs are now having their respective x-rays ostensibly reviewed by the trustees' own selected B-readers instead of relying

18



TRUE AND CORRECT COPY OF ORIGINAL FILED IN SMITH COUNTY CLERK'S OFFICE

on Plaintiffs' B-readers as called for in the CRP. Not surprisingly, the trustees hired three B-readers whom had never been associated with the diagnosis of a single Swan claimant, even though several thousand claims have been filed. Instead, of trying to engage the B-reader (Dr. Klepper) that two separate juries found credible, the trustees again retained hired guns to subvert Plaintiffs' claims. Now the trustees are the judge, jury and executioner since they have abandoned the spirit of the CRP. Just like Swan's strategy at trial, the trustees' experts see no evidence of silicosis or asbestosis in any of the 18 films submitted to the trustees' experts.

46.     Even more perplexing, the trustees now maintain there is no lung disease for mixed dust pneumoconiosis. This is alarming since:

- All the core bankruptcy documents of Swan established mixed dust pneumoconiosis as a compensable claim;

- The Trust has previously paid $25,000,000.00 (mostly TAC members) in claims for mixed dust pneumoconiosis;

- The CRP has two separate compensable disease categories for mixed dust pneumoconiosis;

- Even the trustees' hired gun forecaster, Vasquez, forecast a large percentage of mixed dust claims; and

- Peer reviewed literature from the 1940's to present date recognizes mixed dust pneumoconiosis as a disease, which is especially prevalent in foundry exposures like Tyler Pipe.

- The Claims Manager testified mixed dust pneumoconiosis was "a combination of asbestosis and silicosis" that is manifested in the lungs at the same time. This is completely contrary to Swan's newest expert's

19



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

opinion.

47.    By attempting to eliminate a mandated disease category, the trustees have committed a

per se violation of the Swan Settlement Trust Agreement. Specifically, the Trust Agreement

states:

> The trustees shall be required to obtain the consent of the TAC and the
> legal representative in addition to those instances elsewhere enumerated,
> in order:
>
>> to add or change the schedule of Asbestos and
>> Silica Related Disease Categories or Criteria…

It is undisputed such consent was not obtained from the TAC or legal representative. In sum,

Plaintiffs are dealing with runaway trustees who have no regard for the law, their Trust mandates

and their fiduciary duties.

### 7.  Plaintiffs' Claims Were Unreasonably Delayed

48.    In addition to the unequal treatment discussed above, Plaintiffs' claims are dramatically

delayed compared to members of the TAC's claimants. When the TAC's clients' claims were

filed, hundreds of claims were processed each month. Unless one of the TAC claimants had a

deficiency, their respective clients would normally receive a settlement payment within ninety

(90) days of filing the claim with the Trust. In 2004 alone, the Trust disposed of 1514 claims

compared to just a few dozen annually over the last few years. However, for unexplained

reasons, the trustees just sat on Plaintiffs' claims for six months before taking the ridiculous

position that there is no such thing as mixed dust pneumoconiosis, of which Plaintiffs were

diagnosed. In fact, the Claims Manager just testified that it should only take a month to process a

claim.

49.    According to the CRP, the Trust was "designed to provide prompt determination and

payment of claims." Further, the CRP provides: "Claims will be ordered for processing on a



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

FIFO basis. A claimant's position in the FIFO queue will be determined by the date of receipt by the Trust of Claims material." In Plaintiffs case, their claims were received by the Trust on May 14, 2015. At that time, there were no other claims on file with the Trust. Instead of processing the claims as mandated by the CRP, the trustees shelved Plaintiffs' claims. In September 2015, counsel made inquiry with the Trust as to the unreasonable delay. In response to counsel's inquiry, Hilton sent an email dated September 23, 2015 astonishingly claiming their medical expert believes it is "highly unusual that both [asbestosis and silicosis (mixed dust pneumoconiosis)] would be manifested in a claimant." Moreover, the inquiry by Plaintiffs' counsel resulted in an audit of Plaintiffs' medical claims by three doctors who have never been associated with a compensable claim with the Trust.

50.     On October 8, 2015, counsel for Plaintiffs furnished a letter to the trustees detailing how the Trust has paid over $25,000,000.00 in mixed dust claims; how the CRP mandates payment of such claims; how their own forecasters recognize mixed dust claims; and how their position was contrary to decades of peer-reviewed literature. In response, Plaintiffs' counsel received a letter rejecting their claims stating: "it appears that none of these 18 claimants has an asbestos or silica-related lung disease." These are the very same tactics employed by Swan before it was forced into bankruptcy by very large and resounding jury verdicts. The only difference is the trustees owe Plaintiffs fiduciary duties, including duties of good faith and utmost loyalty, which have been blatantly breached in the instant case.

### 8. The Unequal Treatment of Plaintiffs is Retaliatory and Malicious

51.     The following facts are undisputed:

- 2169 claimants have been paid almost double the compensation currently offered claimants and of the 200 approximate claimants wrongfully



TRUE AND CORRECT COPY OF ORIGINAL FILED IN SMITH COUNTY CLERK'S OFFICE

suppressed at the lower rate, the majority are represented by Plaintiffs' counsel;

- Claimants represented by other counsel have never had their claims reviewed by three separate retained experts and claimants represented by the TAC have never had a Trust expert review their claim; and

- No claimant; other than claimants represented by Plaintiffs' counsel have had their claims shelved for over a half-year before any review process.

52.     Clearly, these tactics are in retaliation for Plaintiffs counsel's continued questioning and scrutiny of the trustees' management practices. Specifically, Plaintiffs' counsel has over the years criticized the trustees very openly as to the following:

- the outrageous cost per claim the Trust was incurring;

- the lack of qualifications and improper methodology of the Trust's forecasting experts;

- the outlandish lung cancer forecasts of the Trust's expert, Vasquez;

- by serving the Trust's counsel with a Petition against TSI and the trustees in 2007;

- by demanding the Trust reduce from three trustees to one; and

- by seeking competitive bids for other auditors and trustees to serve the Trust.

53.     All of this scrutiny Plaintiffs' counsel has lodged at the trustees and their experts is well documented and undisputed. Clearly, the unconscionable and unequal treatment of Plaintiffs is Hilton's retribution and retaliation for questioning his tactics.

54.     The trustees continue to retaliate against claimants represented by Plaintiffs' counsel. Just

22


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

recently, Plaintiffs' counsel received another audit letter out of the blue from another Silica Trust in which TSI has an administrative role. Even though all information concerning a claimant is to be kept confidential, especially medical information, Hilton shared Plaintiffs' audit results with the Kaiser Trust, resulting in an audit letter for additional claimants represented by Plaintiffs' counsel. This is not shocking considering Hilton believes his only duty is to TSI and has no duty of loyalty to Plaintiffs or any claimant for that matter. Moreover, the trustee for Kaiser whom he illegally shared this information is also a director of TSI and has the same self-dealing issues as Hilton.

55.     Ironically, TSI's Mission Statement is: "TSI will provide the highest quality, cost-effective, comprehensive services and managing tort resolution facilities focused on maximizing distributions to beneficiaries." Plaintiffs will unequivocally demonstrate that this TSI mission statement doesn't apply to them, and is an absolute fallacy.

## RELIEF

56.     Fiduciary duties are the highest duties known to the law. Texas Courts hold trustees to a "very high and very strict standard of conduct which equity demands." In the instant case, Hilton, Grooms and Huguenard breached the following fiduciary duties owed to Plaintiffs:

- Duty of loyalty;
- Duty not to delegate;
- Duty of good faith and fair dealing;
- Duty of full and accurate disclosure;
- Duty to preserve Trust property;
- Duty of Impartiality's and;
- Duty to preserve Plaintiffs' confidential information.

23

 TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

57.     Fortunately for Plaintiffs, the Texas Trust Code provides a wide array of legal tools to address runaway trustees convinced of their absolute discretion as to the administration of the Trust.

58.     Pursuant to §114.008 of the Texas Trust Code, Plaintiffs request an appointment of a receiver to take possession of the Trust property and administer the Trust. At the same time, Plaintiffs request that Hilton, Grooms and Huguenard be suspended from their duties as trustees until a jury makes its final determination as to their respective culpability as to the aforementioned breaches of fiduciary duties. And, Plaintiffs request a denial of all the trustees' compensation during the trustees' suspension. Furthermore, for any trustee found to have breached their respective fiduciary duties, Plaintiffs request such breaching party be permanently removed as a trustee pursuant to §113.082 of the Texas Trust Code.

59.     Plaintiffs additionally request, pursuant to Rule 172 of the Rules of Civil Procedure, that the Court appoint an auditor since it appears necessary for the purpose of justice between the parties, especially given the vast amount of waste demonstrated in the Petition. An accounting is particularly necessary since the trustees have recently refused to account to a beneficiary who served statutory mandated accounting requests pursuant to §113.152 of the Texas Trust Code.

60.     Specifically, Plaintiff Mark Little, concerned by the reduced payment percentage he received, sent statutory and common law requests of information to the Swan Trust. Under the Texas Trust Code, these requests are mandated to be answered by the Trust. Rather than responding to Mr. Little's requests, the Trustees sued Mr. Little causing tens of thousands of dollars to be wasted not only by Mr. Little, but also of Trust assets belonging to beneficiaries. The basis of the Trustees suit against Mr. Little was that his requests were harassing, requested confidential information and privileged information. These allegations by the Trustees were

24


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

recently declared frivolous by the Claims Manager of Swan, who testified Mr. Little's requests were not harassing, nor did they seek confidential or privileged information. Under Texas common law, the trustees' conduct is tantamount to fraudulent concealment. Moreover, under the Texas Trust Code, the trustees' conduct in regard to Mr. Little is explicitly stated as grounds for removal of the trustees.

61.     Additionally, Plaintiffs request an injunction prohibiting the trustees from using Trust assets to pay the trustees' legal fees during the litigation. This relief is particularly warranted given the pervasive self-dealing committed by Hilton, with full knowledge of Grooms and Huguenard. Further, Plaintiffs request an injunction compelling the trustees to cease and desist the disparate treatment of Plaintiffs and similarly situated claimants and to void all past disparate acts committed by the trustees.

62.     Plaintiffs would respectfully request an evidentiary hearing within fourteen days after all Defendants have filed their Answer. At such hearing, Plaintiffs will present sufficient evidence to support the requested relief of appointment of a receiver, suspension of Hilton, Grooms and Huguenard; appointment of an auditor, disallowance of using Trust assets for the trustees' attorney fees and costs in defending these serious breaches of fiduciary duties, and the other injunctive relief sought by Plaintiffs.

63.     In addition to the aforementioned relief to be determined at an evidentiary hearing soon after the Defendants' Answer, Plaintiffs request fee forfeiture of all Trust funds paid to TSI, and all compensation paid to Hilton, Grooms and Huguenard. Full disgorgement is warranted given Hilton's blatant and egregious self-dealing from the inception of the Trust, especially given a Federal Judge having expressly informed Hilton of his improprieties years before the formation of the Trust. TSI is the self-dealing instrument that Hilton as an officer and director utilized to


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

wrongfully divert millions of dollars intended for Trust beneficiaries. Because TSI knowingly participated in Hilton's blatant self-dealing and conflicts of interest, it is liable for inducing and aiding Hilton's breach of fiduciary duties and thus, liable as a joint tortfeasor. Likewise, Grooms and Huguenard are liable and subject to fee forfeiture for failing to exercise reasonable care to prevent a co-trustee from committing a serious breach of Trust. Moreover, because Grooms and Hugeunard knowingly allowed Hilton to engage in self-dealing, the Court should forfeit the entirety of their compensation fees. Hilton, Grooms and Hugeunard's compensation should be further denied because the trustees "have not properly taken care of and managed the estate property prudently."

64.    Plaintiffs also seek recovery of their attorney's fees from the Trust or from the trustees pursuant to §114.064 of the Texas Rules of Civil Procedure.

65.    Plaintiffs further seek exemplary damages from the trustees for the clear and serious violations of fiduciary duties, which Plaintiffs will prove by clear and convincing evidence were intentional acts committed by the trustees. Because the trustees' actions constitute misapplication of fiduciary property, there are no limitations to the amount of exemplary damages.

66.    Plaintiffs allege that their damages exceed the minimum jurisdictional limits of this Court. Further, pursuant to T.R.C.P. 47, Plaintiffs affirmatively plead that they seek monetary relief aggregating monetary relief over $1,000,000.00 excluding court costs, pre-judgment interest and attorneys' fees.

## NOTICE OF INTENT

67.    Plaintiffs hereby give notice of intent to utilize items produced in discovery by Defendants in the trial of this matter and the authenticity of such items is self-proven per the Texas Rules of Civil Procedure, 193.7.


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited and answer herein, and upon final trial, Plaintiffs have judgment against Defendants, for forfeiture/disgorgement of all compensation fees paid to the trustees and all monies paid to TSI; exemplary damages as a jury in its discretion awards; appointment of a receiver and auditor; immediate suspension of the trustees and permanent removal of any trustee found by a jury to have committed a breach of fiduciary duty; injunctive relief voiding the past acts of the trustees resulting in disparate treatment of Plaintiffs, costs of court; interest at the legal rate; reasonable and necessary attorney's fees, and for such other and further relief to which Plaintiffs may be justly entitled.

Respectfully Submitted,

HOEFFNER LAW

/s/ W. Todd Hoeffner

W. Todd Hoeffner
State Bar No: 9772750
914 Preston, Ste. 800
Houston, TX 77002
(713) 223-8877 Telephone
(713) 223-8879 Fax
hoeffnerlaw@gmail.com

COUNSEL FOR PLAINTIFFS

LUKE BICKHAM, P.C.
Luke F. Bickham
State Bar No.: 00787080
515 South Vine Avenue
Tyler, Texas 75702
903-533-8820
903-705-6389 - fax
luke@lukebickham.com

CO-COUNSEL FOR PLAINTIFFS

27

 TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN SMITH COUNTY
CLERK'S OFFICE